UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

PATSY L. KING,                      )
            Plaintiff,              )
                                    )      Case No.: 3:10-0750
v.                                  )      JUDGE WISEMAN
                                    )      MAGISTRATE JUDGE BROWN
MICHAEL J. ASTRUE,                  )
Commissioner of Social Security,    )
            Defendant.              )

To: The Honorable Thomas Wiseman, Senior District Judge

## REPORT AND RECOMMENDATION

This is a civil action filed pursuant to 42 U.S.C. § 405(g) to obtain judicial review of the final decision of the Commissioner of Social Security denying Plaintiff Supplemental Security Income (SSI) and Disability Insurance Benefits (DIB), as provided under Title XVI and Title II of the Social Security Act (the "Act"), as amended. Currently pending before the Magistrate Judge is Plaintiff's Motion for Judgment on the Administrative Record and Defendant's Response. (Docket Entries 14, 19). The Magistrate Judge has also reviewed the administrative record (hereinafter "Tr."). (Docket Entry 13). For the reasons set forth below, the Magistrate Judge **RECOMMENDS** the Plaintiff's Motion be **DENIED** and this action be **DISMISSED**.

## I. INTRODUCTION

Plaintiff first filed for SSI and DIB on April 7, 2005 with an alleged onset date of December 2, 2003. (Tr. 25). Her claims were denied initially and on reconsideration. *Id.* At Plaintiff's request, a hearing was held before Administrative Law Judge ("ALJ") Robert C.

Haynes on January 29, 2008, in Nashville, Tennessee. *Id.* On February 29, 2008, the ALJ

rendered an unfavorable decision. (Tr. 25-33).

In his decision, the ALJ made the following findings of fact and conclusions of law:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2008.

2. The claimant has not engaged in substantial gainful activity since December 2, 2003, the alleged onset date (20 CFR 404.1520(b), 404.1571 *et seq.*, 416.920(b) and 416.971 *et seq.*).

3. The claimant has a combination of impairments considered "severe," which includes lumbar degenerative disc disease, carpal tunnel syndrome, status post left decompression surgery, and de Quervain's tendinitis of the left wrist, status post surgery (20 CFR 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform lifting and/or carrying of 50 pounds occasionally and 25 pounds frequently; standing and/or walking of 6 hours in an 8 hour workday; sitting of 6 hours in an 8 hour workday; no frequent bilateral pushing and/or pulling with the upper extremities; occasional climbing of ladders, ropes and scaffolds; no frequent bilateral overhead reaching and handling; and the avoidance of concentrated exposure to vibration.

6. The claimant is capable of performing past relevant work.

7. The claimant has not been under a disability, as defined in the Social Security Act, from December 2, 2003 through the date of this decision (20 CFR 404.1520(f) and 416.920(f)).

(Tr. 27-32). Plaintiff requested review by the Appeals Council on April 3, 2008. (Tr. 6). The

Appeals Council denied review on June 11, 2010. *Id.* Plaintiff filed this timely complaint on

August 9, 2010. (Docket Entry 1).

## II. REVIEW OF THE RECORD

Plaintiff was born on May 2, 1955. (Tr. 415). She is unmarried and lives with her minor son, age seventeen. (Tr. 430). Plaintiff has an 10th grade education with no GED and has past work experience as a machine spray painter, appliance assembler, pizza dough maker, janitor, and fast food worker. (Tr. 82, 415). Plaintiff claims disability because she suffers from de Quervain's left arm tendinitis, carpal tunnel syndrome, degenerative disc disease of the lower lumbar spine, lower back pain, and shoulder pain. (Tr. 89, 424).

Plaintiff began seeing her primary caregiver, Dr. Robert Ferland, on November 18, 1996. (Tr. 256-306). Her primary records mostly concern mammograms and other breast evaluations, but Dr. Ferland began observing wrist and back issues in early 2005. (Tr. 259). On March 14, 2005, Dr. Ferland diagnosed Plaintiff with lower back pain and referred her to a physical therapist. *Id.* He made a similar diagnosis on a follow-up visit on March 28 as well as on August 25. (Tr. 257-58). In all three visits, Dr. Ferland noted that her gait and station were normal and that she had a full range of motion. (Tr. 257-59).

On May 28, 2002, Plaintiff injured her left arm while working as a dough maker at Domino's; she was rolling an 1100-pound bowl across the floor when it ran over a large hole in the floor, jerking her arm. (Tr. 230). She was referred to Star Physical Therapy ("Star") on July 15, 2002, where she was fitted with a fabricated thumb splint so that she could return to work the following day. (Tr. 180-81). Plaintiff then elected for surgery to relieve her de Quervain's left arm tendinitis with Dr. Paul Abbey on August 1, 2002.[1] (Tr. 165). On August 7, 2002, Plaintiff

---

[1]The record is inconsistent as to whether the surgery took place on August 1 or rather on July 3 as noted in Defendant's Response. (Docket Entry 19). Regardless, it is evident from Dr. Abbey's records as well as those from Dr. Davenport that Plaintiff elected to have surgery only

returned to Star and reported that her hand "feels better, it is mainly just sore." (Tr. 178). On August 12, 2002, Plaintiff reported that her thumb was "feeling much better." *Id.* In three appointments the following week, Plaintiff reported decreased pain in her left hand and an increased ability to perform functional tasks. (Tr. 177). She did report a sharp pain near her elbow and difficulty turning knobs with the left hand. *Id.*

Plaintiff returned to Star on August 11, 2003, when she reported no change in her pain level over the previous year. (Tr. 175). On August 18, 2003, Plaintiff reported that her left hand was moving "a little better" but that she continued to have increasing pain. (Tr. 174). Plaintiff continued to report increased pain and tightness over her next few visits. (Tr. 168). She ended her treatment at Star on September 3, 2003. *Id.*

Plaintiff first visited Concentra Medical Center on August 27, 2003, complaining of a shoulder injury she allegedly suffered at Domino's the previous day. (Tr. 197). Dr. Michelle Bruce noted that both shoulders showed no deformity and that Plaintiff had good range of motion except for a little tenderness "at end of ranges" in the right shoulder. *Id.* Dr. Bruce diagnosed Plaintiff with a shoulder strain, prescribed Vioxx, and recommended a home exercise program. *Id.* On August 29, 2003, Dr. Bruce again noted no deformities and diagnosed Plaintiff with a shoulder strain. (Tr. 195). On September 8, 2003, Dr. Bruce noted full range of motion in both shoulders with no tenderness present, again diagnosing Plaintiff with a shoulder strain and releasing her from care. (Tr. 194).

Plaintiff was also referred to NorthCrest Rehabilitation Center on July 31, 2002. (Tr. 184). She complained of increased pain in her left thumb as a result of the de Quervain's surgery

after non-invasive measures proved unsuccessful. (Tr. 165, 202).

and was prescribed a series of gentle stretching exercises designed to relieve tightness. (Tr. 185-88). Plaintiff reported increased function in the left hand on September 3, 2002. (Tr. 189).

Plaintiff was referred to Dr. Michael Milek of the Tennessee Orthopedic Alliance on November 19, 2003. (Tr. 221). Plaintiff stated that the left arm had gotten to the point where it had gone "limp" and that therapy and other conservative treatments had not helped. *Id.* Dr. Milek sent her for an MRI after observing "left sided hand pain" and possible carpal tunnel syndrome. *Id.* At that time, he recommended that Plaintiff continue work with only occasional use of the left hand and no heavy lifting. *Id.* An MRI of the left wrist from Healthsouth Diagnostic Center on November 25, 2003 revealed a tiny cyst but otherwise normal bones and joints. (Tr. 198).

Plaintiff underwent surgery for left carpal tunnel and left second compartment tenosynovitis with Dr. Milek on April 20, 2004. (Tr. 199). A week later, Dr. Milek observed some numbness and tingling in her middle and ring fingers and prescribed Motrin. (Tr. 216). He also remarked that Plaintiff could return to limited work at that time but with no use of the left hand. *Id.* On May 18, 2004, Dr. Milek remarked that Plaintiff's condition was improving slowly and that, if she were to work again, she could use the left arm occasionally, heavy grip occasionally, but not lift over ten pounds.[2] (Tr. 214). On June 15, 2004, Dr. Milek noted that her sensation was normal but that therapy would be stopped as it was making her worse (Tr. 212). He then recommended that Plaintiff could only work with occasional use of the right hand. *Id.* On July 13, 2004, Dr. Milek noted that Plaintiff still has numbness and tingling and is "unable to

---

[2]Plaintiff was not working at the time and has not worked since she was discharged from Domino's on December 2, 2003.

use the hand." (Tr. 210). On August 24, 2004, Dr. Milek noted a four percent impairment to her

arm, which represented a two percent function impairment to her body as a whole. (Tr. 209).

On July 24, 2004, Plaintiff was referred to Dr. David Davenport for a functional capacity

evaluation ("FCE") of her left arm and wrist. (Tr. 201-07). Dr. Davenport tested Plaintiff on

material handling skills including "Floor to Waist Lift," "Overhead Lift," "Bilateral Carry,"

"Unilateral Carry," pushing, and pulling. (Tr. 206). Non-material handling tests included sitting,

standing, walking, bending, and squatting. *Id.* Dr. Davenport observed that Plaintiff was limited

on many of the material handling activities, noting that she often stopped because her wrist hurt;

she even commented at one point that her left hand was "on fire." *Id.* However, he concluded

that Plaintiff was "self-limiting" on most of these tests and that the results reflected her

"perceived capabilities" rather than her actual abilities. (Tr. 207). Particularly of note was her

poor consistency of effort on grip and pinch strength tests. (Tr. 201). Though Plaintiff's heart

rate rose to "above 70% of the projected maximum level on each of the test activities," a rate

which may reflect a level of physical exertion that she would be unable to sustain over a full

workday, Dr. Davenport noted that this may be due in part to Plaintiff's prescription drug Lotrel.

*Id.* Because of Plaintiff's self-limitations, Dr. Davenport was not able to determine her DOT

(Dictionary of Occupational Titles) level of work ability. *Id.*

Plaintiff was referred to Dr. David Gaw of Southern Hills Medical Center for a

consultation on October 25, 2004. (Tr. 232). Dr. Gaw noted that her injuries were likely caused

by her work at Domino's but remarked that she has had "excellent treatment" and was not a

candidate for further surgery. *Id.* Dr. Gaw recommended that Plaintiff avoid continuous twisting

or gripping, or awkward positions of the left wrist, but he noted that she could perform these activities "on an alternating basis." *Id.*

On Plaintiff's March 14, 2005 visit to Dr. Ferland, she also obtained AP and lateral image views of her lumbar spine from Dr. Jeffrey Brannick. (Tr. 240). Dr. Brannick noted that her spine's alignment was within normal limits and that the disc spaces were well preserved. *Id.* He also noted no fractures, deformities, pars defects, or other abnormalities of any kind. *Id.* On September 6, 2005, Plaintiff obtained another MRI of her lumbar spine from Dr. Spencer Madell. (Tr. 239). Dr. Madell found mild disk space narrowing and diffuse disk bulging at L4-5 and a right lateral disk protrusion. *Id.* He diagnosed Plaintiff with degenerative disk disease ("DDD") at L4-5 and recommended clinical correlation. *Id.*

Plaintiff was examined by Dr. Grafton Thurman of Tennessee Disability Determination Services on August 25, 2005. (Tr. 249-53).[3] Dr. Thurman noted that he received no medical records prior to Plaintiff's examination and instead based her medical history on Plaintiff's statements that she had "not been in the hospital overnight in the last year" and that she had had two surgeries on her left hand. (Tr. 249-50). Plaintiff went into the exam complaining of muscoloskeletal back pain, peripheral joint arthralgia (joint pain in the left hand, wrist, and shoulders), left carpal tunnel syndrome, shortness of breath, and high blood pressure. (Tr. 250-51). Upon observation of Plaintiff's behavior around his office, Dr. Thurman noted that Plaintiff has "no apparent shortness of breath or chest pain" based on the fact that she did not wheeze in his office; he also noted that she had a "good steady gait" but got on and off her chair stiffly due

---

[3]Though the initial heading of the examination lists the examiner as "not given," the subsequent heading lists the actual examiner as "P. Williams."

to low back pain. (Tr. 251). Dr. Thurman noted full range of motion in all peripheral joints except for the right shoulder, with no evidence of significant peripheral joint deformity or joint swelling, redness, or tenderness of significance.[4] (Tr. 252). He noted full range of motion of the cervical spine with no evidence of bilateral paraspinous muscle spasm or nerve root compression. Dr. Thurman noted full motor strength in all four extremities and "normal coordination." (Tr. 252-53). In his physical capacity evaluation, Dr. Thurman concluded that Plaintiff had no impairment-related physical limitations. (Tr. 253).

Dr. Saul Juliao, a state consulting physician, performed a Physical Residual Functional Capacity Assessment on September 1, 2005. (Tr. 307-14). He noted that Plaintiff can lift 50 pounds occasionally and 25 pounds frequently, stand and/or walk about 6 hours in an 8-hour workday, sit for about 6 hours in an 8-hour workday, and that she was limited from frequent bilateral pushing and/or pulling in her upper extremities. (Tr. 308). To support these conclusions, Dr. Juliao noted that Plaintiff has left hand CTS, back pain, and shoulder problems. *Id.* Dr. Juliao then concluded that Plaintiff can frequently climb, balance, stoop, kneel, crouch, and crawl, with the exception that she could only occasionally climb ladders, ropes, or scaffolds. (Tr. 309). For Plaintiff's manipulative limitations, Dr. Juliao concluded that reaching and handling were limited but that feeling and fingering were not limited, noting that Plaintiff was limited in her frequent overhead bilateral movement. (Tr. 310). Finally, Dr. Juliao concluded that Plaintiff had no environmental limitations except that she should avoid concentrated exposure to vibration. (Tr. 311).

---

[4]Dr. Thurman noted the right shoulder as "140 degrees of anterior flexion, 140 degrees abduction, 80 degrees external rotation, and 30 degrees internal rotation." The left shoulder, allegedly normal, was identical except for 130 degrees in both anterior flexion and abduction.

Following Plaintiff's DDD diagnosis, Dr. Ferland referred her to Dr. Philip Rosenthal, who first evaluated her on October 25, 2005. (Tr. 339-40). Dr. Rosenthal noted that Plaintiff had active range of motion of the cervical spine and recommended conservative measures including detailed exercises aimed at strengthening and toning lumbar muscles. (Tr. 340). On December 13, 2005, Dr. Rosenthal performed a provocative discogram, which was negative. (Tr. 338). He again recommended conservative measures, especially after Plaintiff reported seeing a response to these measures following her previous visit. *Id.* Another discogram performed on August 28, 2007 was also negative, and Dr. Rosenthal continued to recommend strengthening and toning exercises. (Tr. 336).

Plaintiff saw Dr. Ferland on March 3, 2006 for a routine checkup and to refill medication. (Tr. 370). Dr. Ferland found that her grip strength was reduced in her left hand but that her gait and station were normal. *Id.* He diagnosed her with lower back pain, a left hand injury, and "fatigue/malaise" and prescribed Cymbalta. *Id.* On March 17, 2006, Plaintiff reported feeling much better in response to the Cymbalta, and Dr. Ferland again noted that her gait and station were normal. Dr. Ferland again diagnosed Plaintiff with lower back pain on March 31, 2006, but he did not do so in her six subsequent visits running through November 3, 2006, nor did he diagnose any left arm injury. (Tr. 362-67).

Dr. Ferland prepared a "Medical Statement of Ability to Do Work-Related Activities" on March 10, 2006 for Plaintiff's disability application.[5] (Tr. 356-59). Dr. Ferland first noted that

---

[5]Plaintiff and Defendant argue over whether or not this statement was in fact prepared by a nurse and how that may have played into the ALJ's decision to disregard it or downplay its significance. From the text of the ALJ decision, this consideration appears irrelevant as the statement is considered on its merits regardless of who completed it. A nurse appears to have signed the statement on March 10, and Dr. Ferland appears to have signed it on March 21.

Plaintiff's ability to lift and carry were affected by her impairments, and that she can lift "less than 10 pounds" occasionally and "less than 10 pounds" frequently. (Tr. 356). Dr. Ferland next noted that Plaintiff can stand and/or walk "at least 2 hours in an 8-hours workday" and that she can sit "less than about 6 hours in an 8-hour workday." (Tr. 356-57). He then noted that pushing and/or pulling was limited in both upper and lower extremities. (Tr. 357). To support these conclusions, Dr. Ferland asserted that Plaintiff has "permanent disability of the left hand" as well as reduced range of motion and reduced grip strength. *Id.* He also noted that Plaintiff has lower back pain with radiculopathy, degenerative disc disease, and diffuse disc bulge. *Id.* Dr. Ferland then noted Plaintiff's postural limitations, marking that she can climb, balance, kneel, and crouch occasionally but can never crawl or stoop. *Id.* He then noted Plaintiff's manipulative limitations, concluding that reaching, handling, fingering, and feeling were all limited in the left hand. (Tr. 358). He also noted that Plaintiff can use right and left hand together "frequently" and left hand alone "constantly" when it comes to reaching, handling, fingering, and feeling.[6] *Id.* Finally, he noted Plaintiff's environmental limitations, concluding that she had no such limitations including exposure to vibration. (Tr. 359).

Plaintiff had a series of visits in 2007 with Dr. Michael Rhodes. (Tr. 319-20, 324-35). On June 13, 2007, Dr. Rhodes initially diagnosed Plaintiff with lower back pain and recommended physical therapy. (Tr. 332). On June 15, 2007, Dr. Rhodes performed an MRI on Plaintiff's lower lumbar spine, which revealed "mild degenerative changes" since Dr. Madell's September

---

[6]This is almost certainly a misunderstanding by the nurse/Dr. Ferland of the statement form's scale and a subject of great debate in the ALJ's discussion with Rebecca Williams, Vocational Expert. What ALJ Haynes assumes, and what the nurse/Dr. Ferland almost certainly means, is that Plaintiff is *limited constantly* from using only her left hand for reaching, handling, fingering, and feeling, and that she is *limited frequently* from using left and right hand together.

6, 2005 MRI. (Tr. 319). Dr. Rhodes again diagnosed lower back pain on June 27, 2007 and on July 11, 2007, ordering another MRI after the latter visit. (Tr. 327-28). That MRI, performed on July 30, 2007, revealed "mild degenerative disc changes in the lower lumbar spine, most significant at L4-5." (Tr. 318). Dr. Rhodes again diagnosed lower back pain and prescribed pain medication in three subsequent visits running through October 17, 2007. (Tr. 324-26).

Plaintiff testified in front of Administrative Law Judge Robert C. Haynes at her hearing on January 4, 2008. (Tr. 415-44). She testified that she worked at Domino's for about five years as a dough maker and in sanitation. (Tr. 416). She was injured on the job in August 2002 when she was pulling a 1100 pound bowl across the floor and bent her left arm back when the bowl hit a hole in the floor. (Tr. 419). She left that job in December 2003, her alleged onset disability date. (Tr. 415-16). Prior to Domino's, she testified that she worked for Frigidaire for twenty-one years, where she "shot screws and . . . painted parts" as part of an assembly line before being discharged for disorderly conduct.[7] (Tr. 417-18). She testified that she did not receive any specialized training to perform any of her work at either Domino's or Frigidaire. (Tr. 418).

Plaintiff also worked part-time as a janitor in 1998-99 and for McDonald's as a fast food worker in 1999-2000. (Tr. 445). Plaintiff worked her janitorial job for fifteen hours per week at an hourly wage of $5.50. (Tr. 82). Plaintiff testified that she also performed janitorial work while at Domino's, including cleaning equipment or hard surfaces. (Tr. 446). She worked her fast food job for twenty-five to thirty hours per week at an hourly wage of $5.75. (Tr. 82, 445). Plaintiff testified that this job involved washing dishes and making sandwiches. (Tr. 445).

---

[7]The VE breaks this job up into two parts: appliance assembler ("shooting screws") and machine spray painter ("painting parts").

Plaintiff testified that she had two surgeries performed on her arm by Dr. Michael Milek in 2004 designed to relieve tendinitis and CTS. (Tr. 419-20). After those surgeries, Plaintiff's problems were not alleviated, and she still had severe pain in her wrist and arm which prevented her from lifting items over ten pounds, such as a gallon jug. (Tr. 420). She testified that this pain has been constant since Dr. Milek released her in the fall of 2004. (Tr. 421). Plaintiff testified that she also experiences swelling in her hand and numbness that can reach her forearm and shoulder. (Tr. 421-22). Plaintiff also testified that she has difficulty reaching over her head, though she can reach in general, and that her ability to squeeze with the left hand is "not very good." (Tr. 423-24).

Plaintiff also testified that she has a history of lower back pain and degenerative disc disease that began around March 2005. (Tr. 424). She testified that this pain began when she was trying to mop the floor at her sister's house and felt a sharp pain in her lower back. *Id.* Various medications and therapy did not completely relieve the pain, although a nine-day physical therapy session with Dr. Rosenthal "made it better." (Tr. 425-27). Plaintiff also suffers from spasms in her lower back area. (Tr. 427-28).

Plaintiff testified that she has problems sitting due to her lower back problems and that she can only sit continuously for about an hour before having to shift around or stand. (Tr. 432-33). She testified that she feels "stiff and . . . locked up" when she has to stand after sitting for a prolonged period. (Tr. 433-34). Plaintiff also testified that she can only stand in place for about ten to fifteen minutes, after which she would have to go sit down or lie down. (Tr. 434).

Plaintiff then testified about her day-to-day activities and difficulty performing household chores. (Tr. 435-41). Activities such as turning a page in a book, riding in a car, preparing food,

sweeping, doing laundry, and getting in and out of the tub are difficult due to Plaintiff's constant wrist and back pain. (Tr. 436-40). Plaintiff does very little laundry and prepares only sandwiches or microwave food to eat. (Tr. 437). Plaintiff gets out of the house only to go to doctor's appointments, to get groceries, and to occasionally visit her sister. (Tr. 440). In response to ALJ Haynes' question, Plaintiff admitted that she is "almost totally incapacitated." (Tr. 441).

Plaintiff's niece, Denita Felts, also submitted a written report of Plaintiff's physical limitations. (Tr. 108-16). Felts noted that she helps Plaintiff put on clothes and that she takes Plaintiff to get her groceries once a month. (Tr. 110-11). Felts also does most of the lifting when she is with Plaintiff. (Tr. 113). Plaintiff's sister, Deborah Mabone, also noted in her report that Plaintiff only prepares meals "two times a week with help." (Tr. 119).

Vocational Expert ("VE") Rebecca Williams testified that Plaintiff would be incapable of performing her previous jobs as a dough maker and appliance assembler based on her inability to perform heavy work and her need to avoid constant exposure to vibration. (Tr. 450-51). She testified that Plaintiff did not have any skills that would transfer over to other potential jobs. (Tr. 447). Assuming a limitation of an individual with a capacity to lift 20 pounds with a sit/stand option, Williams testified that such an individual could not perform any of Plaintiff's past relevant work and that no other jobs in the economy would be able to accommodate such limitations. (Tr. 453-55). Assuming the limitations set forth in Dr. Juliao's assessment – 50 pounds occasionally, 25 pounds frequently, six hours standing and six hours sitting[8] – combined with Dr. Ferland's assumed limitations in a left/right hand combination,[9] Williams testified that

---

[8]Tr. 307-11.

[9]Tr. 358, *See* footnote 6 *supra*.

such an individual would be able to perform Plaintiff's past work as a machine spray painter.[10]

(Tr. 451-53). Williams further testified that a person with the physical limitations described by

Plaintiff in her ALJ testimony would be unable to function in a work setting. (Tr. 449).

Alternatively, a person with almost no physical limitation, as described in Dr. Thurman's

evaluation,[11] would be able to perform all of Plaintiff's past relevant work. *Id.*

### III. PLAINTIFF'S STATEMENT OF ERROR AND CONCLUSIONS OF LAW

Plaintiff cites three errors allegedly committed by the ALJ. First, the ALJ erred by not

giving proper weight to the opinion of the Plaintiff's treating physician. Second, the ALJ failed

to give consideration to all the evidence in the record. Third, the ALJ erred in finding that the

Plaintiff can perform her past relevant work.


A.      Standard of Review

This Court's review of the Commissioner's decision is limited to the record made in the

administrative hearing process. *Jones v. Secretary*, 945 F.2d 1365, 1369 (6th Cir. 1991). The

purpose of this review is to determine (1) whether substantial evidence exits in the record to

support the Commissioner's decision, and (2) whether any legal errors were committed in the

process of reaching that decision. *Landsaw v. Secretary*, 803 F.2d 211, 213 (6th Cir. 1986).

---

[10]ALJ Haynes admits that the evaluation discussed in footnote 6, on its face, "sounds a little strange." Williams points out what Dr. Ferland likely meant by his evaluation. Haynes was hesitant to "step . . . into the head of the doctor" but assumes that Williams' interpretation is correct.

[11]Tr. 249-53.

"Substantial evidence" means "such relevant evidence as a reasonable mind would accept as adequate to support the conclusion." *Her v. Commissioner*, 203 F.3d 388, 389 (6th Cir. 1999) (*citing Richardson v. Perales*, 402 U.S. 389, 401 (1971)). It has been further quantified as "more than a mere scintilla of evidence, but less than a preponderance." *Bell v. Commissioner*, 105 F.3d 244, 245 (6th Cir. 1996). Even if the evidence could also support a difference conclusion, the decision of the ALJ must stand if substantial evidence supports the conclusion reached. *Her*, 203 F.3d at 389 (*citing Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)). However, if the record was not considered as a whole, the Commissioner's conclusion is undermined. *Hurst v. Secretary*, 753 F.2d 517, 519 (6th Cir. 1985).

B.      Proceedings at the Administrative Level

The Claimant has the ultimate burden to establish an entitlement to benefits by proving his or her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). At the administrative level of review, the claimant's case is considered under a five-step sequential evaluation process as follows:

1.      If the claimant is working and the work constitutes substantial gainful activity, benefits are automatically denied.

2.      If the claimant is not found to have an impairment which significantly limits his or her ability to work (a "severe" impairment), then he or she is not disabled.

3.      If the claimant is not working and has a severe impairment, it must be determined whether he or she suffers from one of the "listed" impairments[12] or its equivalent; if a listing is met or equaled, benefits are owing without further inquiry.

---

[12] The Listing of Impairments is found at 20 C.F.R., Pt. 404, Subpt. P, Appendix 1.

4.     If the claimant does not suffer from any listing-level impairments, it must be determined whether the claimant can return to the job he or she previously held in light of his or her residual functional capacity (*e.g.*, what the claimant can still do despite his or her limitations); by showing a medical condition that prevents him or her from returning to such past relevant work, the claimant establishes a *prima facie* case of disability.

5.     Once the claimant establishes a *prima facie* case of disability, it becomes the Commissioner's burden to establish the claimant's ability to work by providing the existence of a significant number of jobs in the national economy which the claimant could perform, given his or her age, experience, education, and residual functional capacity.

*Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).

In determining residual functional capacity (RFC) for purposes of the analysis required at steps four and five above, the Commissioner is required to consider the combined effect of all the claimant's impairments, mental and physical, exertional and nonexertional, severe and non-severe. *See* 42 U.S.C. § 423(d)(2)(B).

C.     <u>The ALJ Properly Assessed Plaintiff's Residual Functional Capacity</u>.

Plaintiff argues that the ALJ erred in his finding #5 regarding her residual functional capacity. Specifically, Plaintiff argues that in making this finding, the ALJ gave too little weight to her treating physicians, Dr. Ferland and Dr. Milek, and gave too much weight to the opinions of Dr. Thurman and Dr. Juliao. Plaintiff also argues that the ALJ did not take account of all evidence in the record, including her subjective testimony and the statements of family members. The Magistrate Judge believes that the ALJ properly evaluated all evidence in the record in making his finding regarding Plaintiff's residual functional capacity.

1.     <u>The ALJ Properly Valued the Opinions of Plaintiff's Treating Physicians</u>.

Plaintiff argues that the ALJ did not give enough weight to her treating physicians and instead relied heavily on the opinions of Dr. Thurman and Dr. Juliao in assessing her residual functional capacity. (Pl.'s Br. 12-14). An ALJ should give enhanced weight to the findings and

opinions of treating physicians since these physicians are the most able to provide a detailed description of a claimant's impairments. 20 C.F.R. § 404.1527(d)(2). Further, even greater weight should be given to a physician's opinions if that physician has treated the claimant extensively or for a long period of time. 20 C.F.R. § 404.1527(d)(2)(i)-(ii). However, if there is contrary medical evidence, the ALJ is not bound by a physician's statement and may also reject it if that statement is not sufficiently supported by medical findings.20 C.F.R. § 404.1527(d); *Cutlip v. Secretary of H.H.S.*, 25 F.3d 284 (6th Cir. 1994).

While the ALJ is not bound by the opinions of Plaintiff's treating physicians, the ALJ is required to set forth some sufficient basis for rejecting these opinions. *Shelman v. Heckler*, 821 F.2d 316, 321 (6th Cir. 1987). In discrediting the opinion of a treating source, the ALJ must consider the nature and extent of the treatment relationship, the length of the treatment relationship and the frequency of examinations, the medical evidence supporting the opinion, the consistency of the opinion with the record as a whole, the specialization of the treating source, and any other factors which tend to support or to contradict the opinion. 20 C.F.R. § 404.1527(d)(2); *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541 (6th Cir. 2004).

The ALJ adequately set forth his reasons for rejecting the opinion of Dr. Ferland in his March 10, 2006 functional capacity evaluation.[13] Though Dr. Ferland believes that Plaintiff is limited to under ten pounds of lifting and has postural limitations due to back ailments, substantial evidence in the record demonstrates that Plaintiff is capable of more substantial work activity. Dr. Ferland himself stopped diagnosing Plaintiff with any type of arm limitations after March of 2006 and noted full range of motion even when diagnosing lower back pain in 2005.

---

[13]"Medical Statement of Ability to Do Work-Related Activities." (Tr. 356-59).

(Tr. 257-59, 362-67). All of Dr. Rosenthal's discograms were negative, and he continuously recommended conservative treatment rather than surgery. (Tr. 336-38). Plaintiff testified that she was able to perform various simple households chores, such as folding clothes, and preparing meals, that would not be possible for an individual with the impairments chronicled by Dr. Ferland. (Tr. 435-41). The ALJ also points that despite the fact that Dr. Ferland noted that Plaintiff was unable to lift more than ten pounds frequently, she did so at the exam administered by Dr. Juliao. (Tr. 29). It should also be noted that the ALJ decreased Plaintiff's lifting capabilities in her RFC from the recommendation by Dr. Thurman that Plaintiff had no physical limitations whatsoever. *Id.*

Dr. Ferland's findings that Plaintiff has decreased grip strength and range of motion are also contradicted by other medical records and other evidence in the record. Dr. Davenport reported that Plaintiff's poor showing on her material handling skills test was due to a "self-limiting" effort that did not reflect her actual physical abilities. (Tr. 207). Dr. Gaw also noted that Plaintiff could occasionally use the left hand for gripping or twisting. (Tr. 232). Dr. Ferland himself even noted that Plaintiff had a full range of motion in March and August of 2006. (Tr. 257-59).

Plaintiff alleges that the ALJ rejected Dr. Ferland's assessment based on an "incorrect assumption . . . that the opinion was not Dr. Ferland's but that of an unidentified nurse." (Pl.'s Br. 13). In fact, the ALJ rejected that form assessment on its merits regardless of whether it was completed by Dr. Ferland or his nurse. The ALJ specifically states that the medical evidence does not support the opinion reflected in the assessment and also cites contradicting medical findings

from Dr. Rosenthal. (Tr. 32). Regardless of the debate as to who completed this form assessment, the Magistrate Judge believes that the ALJ had sufficient evidence to dispute it on the merits.

Plaintiff alleges that the ALJ committed legal error by not expressly discussing the opinion of Dr. Milek. However, an ALJ is not expressly required to discuss the opinion of every physician if he indirectly attacks that opinion via analysis of other contradictory evidence in the record. *See Nelson v. Comm'r of Soc. Sec.*, 195 F. App'x. 462, 470 (6th Cir. 2006). The ALJ did not directly address the opinion of Dr. Milek except to note his observation of mild CTS in 2003. (Tr. 29). However, Dr. Milek's opinion is almost identical to that of Dr. Ferland – that Plaintiff is almost incapable of performing work with the left hand. (Tr. 210). The ALJ properly discredited this opinion by pointing out contradictory medical evidence and other testimony that showed Plaintiff's ability to use her left hand. (Tr. 29-32).

      2.      The ALJ Properly Considered Plaintiff's Subjective Complaints of Disability.

Plaintiff contends that the ALJ did not consider all evidence in the record based on the notion that he did not properly weigh Plaintiff's subjective complaints or expressly discuss lay witness testimony. (Pl.'s Br. 15). An ALJ's finding on the credibility of a claimant is to be accorded great weight and deference, particularly since the ALJ is charged with the duty of observing the witness's demeanor and credibility. *Walters v. Commissioner of Social Security*, 127 F.3d 525 (6th Cir. 1997) (citing 42 U.S.C. § 423 and 20 C.F.R. 404.1529(a)). Further, discounting the credibility of a claimant is appropriate where the ALJ finds contradictions from medical reports, claimant's other testimony, and other evidence. *Id*. Like any other factual finding, however, an ALJ's adverse credibility finding must be supported by substantial evidence. *Doud v. Commissioner*, 314 F. Supp. 2d 671, 678-79 (E.D. Mich. 2003).

Here, medical evidence and other testimony support the ALJ's finding that Plaintiff's subjective complaints of disability are not entirely credible. Most notably, Plaintiff's "self-limiting" effort on Dr. Davenport's examination supports a finding that she may be exaggerating her symptoms. (Tr. 207). Plaintiff's claim that she is "totally incapacitated" is contradicted by her regular completion of household chores such as laundry and cooking. (Tr. 437). Her claim of a disabling back impairment is also not supported by medical evidence: MRI's consistently show only mild disc degeneration, and her doctors have continuously recommended conservative measures such as therapy and pain medication over back surgery. (Tr. 318, 324-26). All of these show that Plaintiff's complaints "exceed what is shown by the objective evidence." (Tr. 29).

Plaintiff also contends that the ALJ did not properly consider the subjective complaints of Denita Felts and Deborah Mabone. When it comes to the testimony of lay witnesses, an ALJ is not expressly required to discuss their testimony if he stated that he considered all evidence in the record. *See Miracle v. Astrue*, No. 3:06-0918, 2009 WL 5066879, at *21-22 (M.D. Tenn. 2009). The ALJ here expressly stated that he considered all opinion evidence in accordance with regulations. (Tr. 28). Furthermore, to the extent that the opinions of Felts and Mabone may be different from Plaintiff's own testimony, their statements are similarly contradicted by medical evidence that does not suggest wholly disabling impairments. Therefore, the ALJ's failure to expressly discuss the testimony of Felts and Mabone does not amount to "significant legal error." (Pl.'s Br. 15).

D.      The ALJ Properly Concluded That Plaintiff Can Perform Past Relevant Work

Plaintiff contends that the ALJ erred in concluding that Plaintiff can perform her previous jobs as a machine spray painter, fast food worker, and appliance assembler.[14] (Pl.'s Br. 16). Plaintiff does not specifically challenge the finding regarding the machine spray painter work but seems to suggest that the ALJ erred by asking improper questions about functional limits to the VE. *Id.* The ALJ should accept the VE's testimony in response to a hypothetical question that includes the work-related limitations that the ALJ finds are supported by the record. *Miller v. Sec'y of Health and Human Servs.*, No. 89-6579, 895 F.2d 1414, at *2 (6th Cir. 1990). The ALJ can reject VE testimony that is based on work-related limitations that are not supported by the record. *McCormick v. Sec'y of Health and Human Servs.*, 861 F.2d 998, 1002-03 (6th Cir. 1988).

The ALJ asked the VE a series of hypothetical questions based on various ranges of work-related limitations. (Tr. 448-53). Based on these questions, the ALJ correctly determined that Plaintiff would be able to perform her previous job as a machine spray painter based on the limitations set forth in his finding regarding her residual functional capacity. (Tr. 453). His hypothetical questions to the VE on pages 451-53 of the record reflect physical limitations expressed by Dr. Juliao in his RFC Assessment,[15] which are almost identical to the limitations the ALJ adopts in his finding #5. (Tr. 27-28, 451-53). Based on these limitations, in addition to a left/right hand combination from Dr. Ferland's assessment (which is more limiting than the RFC that the ALJ ultimately adopts),[16] the VE testified that Plaintiff would be capable of performing

---

[14]The ALJ erred in stating that Plaintiff would not be able to work as a janitor due to the need to avoid exposure to vibrations. In fact, the VE testified that such exposure would eliminate her job as an appliance assembler, not as a janitor. This is insignificant error since Plaintiff was deemed capable of performing two remaining past relevant jobs.

[15]Tr. 307-14.

[16]Tr. 358.

her previous work as a machine spray painter. (Tr. 453). Therefore, the ALJ's finding that Plaintiff can perform this past relevant work is supported by adequate VE testimony based on work-related limitations supported by the medical evidence in the record.

Plaintiff also contends that the ALJ erred in finding that her remaining part-time jobs constituted past relevant work because they were not "substantial and gainful activity" under 20 C.F.R. § 404.1572. "Substantial" activity is work activity that involves significant physical or mental activities and may include part-time work. 20 C.F.R. § 404.1572(a). "Gainful" activity is work activity done for the purpose of pay or profit, whether or not a profit is realized. 20 C.F.R. § 404.1572(b). It is clear that Plaintiff received pay and performed significant physical and mental activity, such as washing dishes, cleaning surfaces, and making sandwiches, in both her part-time janitorial and fast food jobs. (Tr. 82, 445-46). Therefore, the ALJ did not err in concluding that these jobs constituted past relevant work. The Magistrate Judge believes that the ALJ considered all relevant evidence and correctly determined that Plaintiff is capable of performing past relevant work.

## IV.  RECOMMENDATION

In light of the foregoing, the Magistrate Judge **RECOMMENDS** that Plaintiff's Motion be **DENIED** and this action be **DISMISSED**.

Any party has fourteen (14) days from receipt of this Report and Recommendation in which to file any written objection to it with the District Court.  Any party opposing said objections shall have fourteen (14) days from receipt of any objections filed in which to file any responses to said objections.  Failure to file specific objections within fourteen (14) days of receipt of this Report and Recommendation can constitute a waiver of further appeal of this

Recommendation. *Thomas v. Arn*, 474 U.S. 140 (1985); *Cowherd v. Million*, 380 F.3d 909, 912 (6th Cir. 2004) (en banc).

ENTERED this 14th day of June, 2011.


/s/Joe B. Brown
JOE B. BROWN
United States Magistrate Judge